## CIRCUIT COURT OF PRINCE WILLIAM COUNTY

Prince William County
Service Authority

v.

Virginia-American Water Co.

September 22, 1993

Case No. LA 30361

By Judge Frank A. Hoss, Jr.

In this case, the Plaintiff, Prince William County Service Authority (the "Authority"), seeks to condemn the entire waterworks system of the Defendant, the Virginia-American Water Company (the "Company"), a private water company operating and serving an area within Prince William County.

This court, having previously ruled that the Authority was required to produce evidence to prove the necessity of the condemnation pursuant to § 15.1–237 of the Code of Virginia, held a hearing on August 16, 1993, at which time evidence was presented by both parties on that issue. After considering the evidence presented and the arguments of counsel provided through memorandum, I am of the opinion that the Authority has failed to meet its burden of proving the necessity of the condemnation.

In making this ruling, I have relied upon the similarity in facts and the holding in the case of *Stanpark Realty Corp. v. City of Norfolk*, 199 Va. 716 (1958). In addition, I have applied the test set forth in *Miller v. Town of Pulaski*, 114 Va. 85 (1912), which held that such a taking must:

> (1) combine the greatest benefit to the public with the least inconvenience and expense to the condemning party and property owner consistent with such benefit, and

(2) does not include the taking of land which may merely render the improvement more convenient or less expensive, or for a necessity which is merely colorable.

It is clear that the proposed use of the subject property is for a "public purpose." However, as the Company correctly asserts, acting to advance a public purpose is independent from and not probative on the issue of the necessity of the condemnation. Instead, as the Company suggests, such a showing of "public purpose" is a threshold requirement which must exist before the court can even reach the necessity issue. I have concluded that both parties came to the issue of necessity on equal footing with no deference being due the legislative decision to condemn. This is so because § 15.1–237 clearly provides that such judicial review could readily be avoided by the taking being "declared by resolution of the governing body following a public hearing . . ." which, everyone concedes, was not done in this instance. Finally, I have considered the evidence under a preponderance of the evidence standard with the Authority having the burden of proof.

The evidence presented at the August 16th hearing went to prove one or more of four distinct but related propositions, all of which bear on the necessity issue: (a) the Authority was established for the purpose of creating a "unified integrated" water system in the county; (b) the taking would provide certain "economics of scale"; (c) the taking would foster rate equalization and excessive rates could be avoided; and (d) the taking would solve the problem of providing water service to the Oakridge-Forest Grove area.

I make the following findings on these issues.

(A) *Creation of a "unified integrated" water system*

To date, the lion's share of the acquisitions made by the Authority have been the assimilation of all existing sanitary districts in the county which were experiencing problems with water quality and service, together with one private company on Bull Run Mountain which was experiencing difficulty in providing water to its customers.

None of these acquisitions were challenged by the property owners.

The Company, which has been in business in the county since 1966, has experienced no problems and has in fact provided exemplary water and service to its customers (both entities obtain their water from the same source).

Few, if any studies were undertaken by the Authority to buttress its conclusion that a unified system as it envisioned would accomplish this purpose or whether such a unification could realistically be accomplished.

Such a large governmental undertaking as a unified water system for the entire county of Prince William is not consistent with the admitted studies underway, initiated by the county government, to the end of considering privatization of many governmental functions.

(B) *Economies of scale*

For the most part, the economies of scale the Authority suggests would be achieved by this taking are speculative, as illustrated by the lack of studies, public or otherwise, to support this assertion.

The acquisitions made by the Authority to date have provided few such economies. It takes the Authority 72 employees to provide service to the 36,000 customers in its service territory while the Company services its 36,000 customers in northern Virginia with 54 employees.

In other areas, where such acquisitions were undertaken, municipal water authorities experienced "diseconomies of scale." (Testimony of Fred Miller concerning five such entities in Florida.)

The acquisition is contrary to the current privatization studies of the county, such studies having been prompted by county staff findings that cost cutting factors such as hiring fewer workers, less overhead, more efficient management, lower labor costs/benefits and higher worker productivity could be realized.

(C) *Rate equalization; Reduction of excessive rates*

Rates are not now uniform within the Authority's service area. While its witnesses testified that such a result was desired, there were no studies or specific plans to implement such an equalization.

The rates for services doubled in the Bull Run Mountain area and increased in the Occoquan Sanitary District area after both were acquired by the Authority.

The anticipated 10% rate decrease for the area served by the Company as the result of the taking is speculative at best, especially in light of post-acquisition experience with other takings. Further, it should be noted that this projection is acknowledged to be contingent upon acquiring the subject property at the offered price of $14 million, a figure the Company submits is so low as to suggest it was not a bona fide offer and which may be as much as $40 million less than the actual

value. The court makes no finding as to the actual value of the Company's waterworks system but does note that it is a rare case when commissioners value the take at the price offered.

There was no showing that the rates of the Company, which are governed by the State Corporation Commission, were excessive.

(D) *Supplying the Oakridge-Forest Grove area*

It is not a financial burden nor a long-term policy deterrent for the Authority to have to contract with the Company to transport its water through some of the Company's lines. The willingness of the Company to contract for that service has been apparent in the past and promised for the future. Transport contracts, such as the one in existence between the parties here, are "commonplace in the industry."

The cost of transporting the water to serve the indicated area has been $10,000.00 to $30,000.00 a year which, in light of the $30 million annual operating revenue of the Authority, is hardly a compelling cost consideration.

The Authority could construct its own line to service the affected area at a cost of $1 to $1.3 million, a figure far below even the Authority's offer of $14 million to purchase the Company. There is a want of studies, either public or otherwise, that would specifically illustrate how this acquisition would resolve the Oakridge-Forest Grove concern.

### Conclusion

Based on the foregoing, I am of the opinion that the evidence presented by the Authority falls short of meeting the test of necessity enunciated in *Miller*. Thus, I direct that counsel for the Company prepare an order consistent with this opinion dismissing this case.